## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| USG COMPANIES, INC. f/k/a | : | CIVIL ACTION NO. 1:17-CV-861 |
| DALTON'S CLUB MARKETING | : | |
| SERVICES, INC., LOTT COMPANIES, | : | (Chief Judge Conner) [1] |
| LTD. f/k/a CMS PARTNERS LTD., and | : | |
| DALTON LOTT, | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| v. | : | |
| | : | |
| ADVANTAGE SALES & | : | |
| MARKETING LLC, | : | |
| | : | |
| **Defendant** | : | |

### MEMORANDUM

Plaintiffs USG Companies, Inc., Lott Companies, LTD., and Dalton Lott (together, "the USG Entities") filed suit against defendant Advantage Sales & Marketing LLC ("Advantage") alleging breach of contract and breach of the covenant of good faith and fair dealing. Advantage moves to dismiss the USG Entities' complaint under Federal Rule of Civil Procedure 12(b)(6). (Doc. 8). The court will grant Advantage's motion.

### I.    Factual Background & Procedural History

In June 2014, the USG Entities agreed to sell the assets of their business to Advantage. (Doc. 1 ¶ 10; see Doc. 1, Ex. A). The parties executed an Asset Purchase Agreement (hereinafter "APA") to govern the sale. (Doc. 1 ¶ 10; Doc. 1, Ex. A).

---

[1] The above-captioned matter was designated for service to the above-signed judicial officer by the Chief Judge of the United States District Court for the District of Delaware on September 21, 2017.

Section 1.7 of the APA is an "earn-out" provision, under which Advantage would make an additional payment to the USG Entities—beyond the amount paid at closing—if the acquired business met or exceeded targeted revenue in the year following the sale.[2] (Doc. 1 ¶ 10).  The APA's earn-out clause contemplates three tiers of possible additional payments.  (Id. ¶ 20).  Each is contingent on the revenue generated by the acquired business during the earn-out measurement period: if revenues were between $17.6 and $18.6 million, the earn-out payment would be $5.7 million; if revenues were between $18.6 million and $19.85 million, the earn-out payment would be $8.55 million; and if revenues exceeded $19.85 million, the earn-out payment would be $11.4 million.  (Id.)  The clause also contains language indicating that any disagreements about revenue calculations for the earn-out measurement period would be referred to an accounting firm for final and binding resolution.  (APA § 1.7(a)).

Following the twelve-month earn-out period, the parties' respective revenue calculations differed substantially.  (Doc. 1 ¶ 26).  Advantage calculated that revenue generated by the acquired business met the first tier of the earn-out provision.  (Id.)  The USG Entities, however, contended that revenue met or exceeded the third tier.  (Id. ¶ 3).  The substantial differences in the parties' calculations stemmed primarily

<hr>

[2] Earn-out provisions are commonly included in asset purchase agreements to resolve differences regarding the value of an acquired business, particularly its future-earnings potential.  George L. Blum, Annotation, *Breach of Contract or Implied Covenant of Good Faith and Fair Dealing with Respect to Earnout Provision*, 34 A.L.R. 7th Art. 2 § 1 (2017).

from disagreements regarding interpretation of the terms "Revenue" and "Business" as contained in the APA. (Id.)

The parties further disagreed about how their dispute should be resolved. See Advantage Sales & Mktg. LLC v. USG Cos., No. 1:15-CV-1225-RGA, 2016 WL 2588163, at *1 (D. Del. May 4, 2016). The USG Entities argued that Section 1.7 of the APA required arbitration. Id. Advantage, on the other hand, contended that contract-interpretation issues were outside the scope of Section 1.7 and required resolution by a court as described in the APA's forum-selection clause. Id.

Advantage filed suit in this court, seeking declaratory judgment regarding arbitrability of the dispute and a determination that Advantage's interpretations of the terms "Revenue" and Business" were correct. Advantage Sales & Mktg. LLC v. USG Cos., No. 1:15-CV-1225-RGA, Doc. 1 (D. Del. Dec. 30, 2015). In response, the USG Entities moved to compel arbitration and dismiss the complaint. Id., Doc. 6. They asserted that Section 1.7 is a valid arbitration clause and that the scope of arbitration is broad enough to include disputes about the meaning of contractual terms necessary to determine the earn-out payment. Id. The court held that (1) Section 1.7 constituted an agreement to arbitrate under the Federal Arbitration Act, and (2) interpretation of the terms "Revenue" and "Business" in the APA could be properly considered by the arbitrator in resolving the earn-out dispute. Advantage Sales & Mktg. LLC, 2016 WL 2588163, at *1-2. Accordingly, the court granted the USG Entities' motion to compel arbitration and dismissed Advantage's declaratory judgment action. Id. at *2.

After submitting the earn-out dispute to arbitration, but before receiving a final decision, the USG Entities filed the instant suit alleging breach of contract and breach of the covenant of good faith and fair dealing. (Doc. 1). The USG Entities averred that they were "compelled to file this action" before the arbitrators issued a final decision to "protect their legal rights" under Delaware's three-year statute of limitations. (Id. ¶ 4). They suggested that the case be stayed pending the outcome of arbitration. (Id.) The arbitrators issued a final decision in favor of Advantage shortly thereafter. (Doc. 10-1, Ex. 2 at 1-11).[3] They determined that (1) Advantage was required to pay only the first-tier earn-out payment and (2) the USG Entities were responsible for costs of arbitration. (Id. at 7-9).

In their complaint, the USG Entities allege that Advantage engaged in intentional misconduct and unreasonable business practices in breach of Section 4.4 of the APA and the implied covenant of good faith and fair dealing. (Id. ¶¶ 19-25). This behavior, they assert, resulted in artificially deflated revenue numbers, thus reducing the earn-out payment owed under the APA. (Id. ¶ 11). Advantage moves to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). The motion is fully briefed and ripe for disposition.

---

[3] Advantage included a copy of the arbitration award with its motion to dismiss. We refer to this award for background only and do not rely on the decision or any facts therein in deciding the instant motion to dismiss. The USG Entities ostensibly do not dispute the authenticity of the arbitral decision. (See Doc. 15 at 5 n.1). Nevertheless, they did not base their complaint on that decision, and thus we may not consider it in resolving Advantage's Rule 12(b)(6) challenge. See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

## II.    **Legal Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents" attached to a defendant's motion to dismiss if the plaintiff's claims are based upon these documents.  Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a

claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

A motion to dismiss may assert issue preclusion or claim preclusion.  See Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 173 (3d Cir. 2010).  But because preclusion "is an affirmative defense that typically may not afford the basis for a Rule 12(b)(6) dismissal," it must be "apparent on the face of the complaint."  Hoffman v. Nordic Nats., Inc., 837 F.3d 272, 280 (3d Cir. 2016) (citations and internal quotation marks omitted).  The Third Circuit, however, has taken a broad view of the phrase "the face of the complaint," indicating that it is coextensive with the general Rule 12(b)(6) limitations which include not only the complaint but also matters of public record, exhibits attached to the complaint, and undisputed materials embraced by the complaint but provided by the defendant.  Id. at 280 & n.52 (citations omitted).

## III.    **Discussion**

Advantage contends that the USG Entities are simply unhappy with the arbitration decision and now seek a "second bite at the apple" through the instant

litigation. In Advantage's view, that endeavor is thwarted by both issue preclusion and claim preclusion. We will address these arguments *seriatim*.

## A. Preclusion

As a threshold matter, neither party has addressed whether state or federal preclusion law controls in the instant diversity action. The waters are muddied further by the fact that there is no prior state or federal court judgment, as the decision upon which Advantage relies for preclusion is an unconfirmed arbitration award.[4] As the Sixth Circuit has noted, the issue of what preclusion law to apply to an unconfirmed arbitration award "is undeveloped and murky." W.J. O'Neil Co. v. Shepley, Bullfinch, Richardson & Abbott, Inc., 765 F.3d 625, 629 (6th Cir. 2014) (citations omitted); see also 18B CHARLES ALLEN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4475.1 (2d ed. 2018) ("The source of the law that governs the preclusion consequences of an arbitration award has not been much developed."). Nonetheless, as we note *infra*, there is no meaningful distinction between federal and state law as it pertains to preclusion in this case. Because application of either jurisdiction's preclusion law works the same result, we need not decide this difficult question.

### 1. *Issue Preclusion*

Under both federal and Delaware law, the party asserting issue preclusion must establish four elements. The federal elements are: "(1) the identical issue was

---

[4] By "unconfirmed" we mean that the arbitration award was not confirmed by a state or federal court as set forth in 9 U.S.C. §§ 9 and 13 and thus lacks the status of a judgment. See McDonald v. City of West Branch, 466 U.S. 284, 288 (1984).

previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 249 (3d Cir. 2006) (citation omitted). Delaware law mandates similar requirements, including (1) identity of issues, (2) a prior final adjudication on the merits, (3) the party against whom issue preclusion is asserted was a party or in privity with a party in the prior proceeding, and (4) the party against whom issue preclusion is asserted "had a full and fair opportunity to litigate the issue in the prior action." Betts v. Townsends, Inc., 765 A.2d 531, 535 (Del. 2000) (citation omitted).

Advantage argues that, under either standard, the issues raised herein were already litigated and resolved in arbitration. Advantage contends that the instant claims merely attempt to relitigate calculation of revenue during the earn-out measurement period and the resultant earn-out payment. We disagree.

The USG Entities' complaint centers on Advantage's purported misconduct during the earn-out measurement period. They specifically allege that Advantage took actions which reduced revenue, including failing to comply with a customer's service request, resulting in loss of the contract, and cancelling an account based on an alleged conflict of interest. (Doc. 1 ¶¶ 12-13). The USG entities further aver that, to manipulate revenues, Advantage altered the accounting on certain accounts to exclude the revenue generated thereby; failed to include bonuses received after the measurement period for services rendered during that period; and refused to assign accounts to personnel acquired from the USG Entities until after the

measurement period. (Id. ¶¶ 14-16). According to the USG Entities, Advantage also acted in a commercially unreasonable manner by failing to continue gas and car allowances that the USG Entities previously provided to their employees, resulting in a loss of personnel and revenue, and by reducing commissions collected from certain customers during the measurement period. (Id. ¶¶ 17-18).

The arbitration, *per contra*, was much narrower in scope. That proceeding was limited to three issues: (1) the meaning and construction of the terms "Revenue" and "Business" as defined and used in the APA; (2) the amount of revenue, under the appropriate construction of that term, generated during the earn-out period, and what earn-out payment tier that calculation implicated; and (3) whether the APA permits pre-award interest to accrue on the earn-out payment, and if so, whether interest should be awarded. (Doc. 10-2, Ex. 10 at 2-3).[5]

Under no reading of the complaint can we say that the issues submitted to arbitration are "identical" to the issues raised in this litigation. The primary focus in arbitration was determining what constituted "revenue" under the APA, and then calculating total revenue for purposes of the earn-out payment. The issues submitted to arbitration did not concern whether Advantage took actions that may have artificially deflated revenue calculations for the earn-out period or that rose to the level of commercial unreasonableness. Accordingly, Advantage cannot

---

[5] Exhibit 10 is the parties' dispute resolution submission agreement. This document is properly considered at the motion-to-dismiss stage because it was relied on by the USG Entities in their complaint, (see Doc. 1 ¶ 2), was attached by Advantage to the motion to dismiss, (see Doc. 10-2, Ex. 10 at 1-10), and its authenticity is undisputed. Belichick, 605 F.3d at 230.

establish the first element required for issue preclusion—identity of issues—under either state or federal preclusion law.

## 2. *Claim Preclusion*

Advantage next asserts that the USG Entities' claims are foreclosed by the doctrine of claim preclusion. According to Advantage, the USG Entities' present claims were already decided in arbitration or, alternatively, should have been raised there in the first instance.

Neither party addresses what preclusive effect an unconfirmed arbitration decision has in a subsequent federal diversity case. The Third Circuit has not directly spoken on this issue. But arbitration awards, even when unconfirmed, are generally accorded preclusive effect if the same issues or claims are later raised in court proceedings. Sheet Metal Workers Int'l Ass'n Local Union No. 27 v. E.P. Donnelly, Inc., 673 F. Supp. 2d 313, 320-21 (D.N.J. 2009) (citations omitted); see also Witkowski v. Welch, 173 F.3d 192, 200 (3d Cir. 1999) (citing RESTATEMENT (SECOND) OF JUDGMENTS §§ 13, 84 (AM. LAW INST. 1982)); In re Kaplan, 143 F.3d 807, 815 (3d Cir. 1998); RESTATEMENT (SECOND) OF JUDGMENTS § 84(1) (AM. LAW INST. 1982). To hold otherwise would permit those dissatisfied with the results of arbitration to file suit alleging the same claims or defenses, rendering arbitration "substantially worthless." 18B CHARLES ALLEN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4475.1 (2d ed. 2018).

The slight differences between federal claim preclusion and Delaware claim preclusion are immaterial here. Both standards require that the current suit and the prior suit concern the "same cause of action," that the same parties or their

privies are involved in both suits, and that the prior judgment is a final judgment on the merits.  See Davis v. Wells Fargo, 824 F.3d 333, 341 (3d Cir. 2016); RBC Capital Mkts., LLC v. Educ. Loan Tr. IV, 87 A.3d 632, 643 (Del. 2014) (citing LaPoint v. AmerisourceBergen Corp., 970 A.2d 185, 192 (Del. 2009)).  Under Delaware law, courts consider two additional requirements: that the original court had proper subject matter and personal jurisdiction, and that the issues in the previous action were decided adversely to the party or parties against whom claim preclusion is being asserted.  See RBC Capital Mkts., LLC, 87 A.3d at 643 (citing LaPoint, 970 A.2d at 192).  In the case *sub judice*, the parties only dispute whether the instant claims are based on the same "cause of action" that was decided by arbitration.

Both Delaware and federal courts follow a "transactional" approach to determining whether the same "cause of action" is at issue.  LaPoint, 970 A.2d at 193; see also Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 276-77 (3d Cir. 2014).  Under this approach, a plaintiff is required to "present all claims arising out [of] the same occurrence in a single suit" to avoid piecemeal litigation.  Blunt, 767 F.3d at 277 (alteration in original).  The Delaware Supreme Court has explained that whether claims arise from the same "transaction" requires determining if the underlying facts "are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."  LaPoint, 970 A.2d at 193.

Unlike issue preclusion, claim preclusion thus "gives dispositive effect to a prior judgment if 'a particular issue, although not litigated, could have been raised

in the earlier proceeding.'" <u>Churchill v. Star Enters.</u>, 183 F.3d 184, 194 (3d Cir. 1999)

(quoting <u>United States v. Athlone Indus., Inc.</u>, 745 F.2d 977, 984 (3d Cir. 1984)); <u>see</u>

<u>also</u> <u>T.A.H. First, Inc. v. Clifton Leasing Co.</u>, 90 A.3d 1093, 1095-96 & nn.4, 8 (Del.

2014). In other words, claim preclusion "extends to all issues which might have

been raised and decided in the first suit as well as to all issues that were actually

decided." <u>RBC Capital Mkts., LLC</u>, 87 A.3d at 644 (quoting <u>LaPoint</u>, 970 A.2d at

191-92). The USG Entities' current claims were not raised in arbitration. The

dispositive question for claim preclusion purposes is whether they should have

been.

An analysis applying the "transactional" approach would typically answer

the question of whether the USG Entities' instant claims and the prior decision are

based on the same "cause of action," thereby determining whether the instant

claims should have been raised previously. The prior decision relied upon by

Advantage, however, is an unconfirmed arbitration award, which involved arbitral

jurisdiction expressly limited by the terms of the APA. "An arbitration proceeding

is much like an adjudication before a court of limited jurisdiction so far as the scope

of its authority is concerned[.]" Restatement (Second) of Judgments § 84 cmt. (f)

(Am. Law Inst. 1982). Hence, whether claim preclusion applies here turns on

whether the USG Entities' claims fall within the scope of the arbitration provision.

If they do, it necessarily follows that the USG Entities should have raised their

claims during arbitration, and therefore the doctrine of claim preclusion would bar

the instant litigation.

The relevant arbitration provision reads, in pertinent part: "If Buyer and Sellers are unable to resolve *any disagreement with respect to the calculation of Revenue for the Measurement Period*," the disputed amounts "will be referred to the Accounting Firm . . . for final determination[.]" (APA § 1.7(a)) (emphasis added). The USG Entities posit that their instant breach and good faith issues are beyond the scope of this limited arbitration provision. Advantage counters that, regardless of how the claims are styled, the USG Entities are essentially challenging the "calculation of revenue" for the earn-out payment. Advantage further argues that the allegations the USG Entities now raise all concern the same measurement period, relate directly to how revenue was determined for the earn-out payment, and seek the exact same remedy sought in arbitration—a higher earn-out payment. According to Advantage, the arbitration provision is broad enough that the USG Entities could have, and should have, raised the instant claims during arbitration.

There appears to be a split of authority regarding this exact issue. Some courts have found that disputes regarding "operational practices" and "business misconduct" are within the scope of arbitration provisions limited to resolving disputes over calculations and financial obligations. See Shy v. Navistar Int'l Corp., 781 F.3d 820 (6th Cir. 2015); JPD, Inc. v. Chronimed Holdings, Inc., 539 F.3d 388 (6th Cir. 2008). Other courts, *per contra*, have construed the scope of limited arbitration clauses more narrowly. See Fit Tech, Inc. v. Bally Total Fitness Holding Corp., 374 F.3d 1 (1st Cir. 2004); Powderly v. MetraByte Corp., 866 F. Supp. 39 (D. Mass. 1994). Analysis of these decisions is instructive *sub judice*.

### a.      The Sixth Circuit's Approach

The Sixth Circuit has adopted the broader view, holding that operational practice and business misconduct claims may fall within the scope of arbitration provisions governing what are essentially calculation disputes.   In Shy v. Navistar International Corp., 781 F.3d 820 (6th Cir. 2015), the court of appeals considered whether a dispute regarding the business conduct of Navistar International Corporation ("Navistar") fell within the scope of a settlement-agreement arbitration clause concerning Navistar's contribution obligations to a benefit trust for its retired employees.  The clause required "disputes" over the "information or calculation[s]" provided by Navistar regarding its financial obligations to be referred to an accountant for binding determination.  Navistar, 781 F.3d at 823.  The benefit trust's manager took issue with Navistar's method for classifying certain subsidies—a method that directly affected Navistar's profit-sharing obligations— and sought to enforce the settlement agreement in federal district court.  Id.  The trust manager later moved to amend its complaint to include additional charges that Navistar "manipulated its corporate structure and accounting analysis to eliminate its profit-sharing obligations" in violation of the settlement agreement. Id. at 824.  Navistar sought dismissal of the amended complaint, arguing that the issues raised therein were subject to arbitration.  Id.  The district court agreed, finding, *inter alia*, that all of the trust manager's claims were subsumed by the arbitration clause.  Id.

On appeal, the Sixth Circuit affirmed.  Id. at 824-25.  It found that although the arbitration provision had a narrow scope, the crux of the trust manager's claim

was that Navistar had "misclassified various aspects of its business," thereby causing incorrect information to be provided to the trust manager.  Id. at 825.  Such claims, the court held, were within the scope of the arbitration clause.  Id.  The court further reasoned that even if the trust manager's claims extended past categorization "to the operational practices of Navistar," those claims were so closely tied to the "information" provided to the trust manager that the arbitration provision still applied.  Id.  In particular, the court explained that even though several of the trust manager's claimed violations were "phrased in part as though they were *operational violations involving business misconduct*," those claims were still subject to arbitration.  Id. at 826 (emphasis added).  The court concluded that "operational disputes may be committed to accountant arbitration, if the language of the arbitration clause . . . can fairly be read to cover such disputes."  Id. at 827.

In a similar Sixth Circuit case, cited approvingly in Navistar, the court of appeals likewise found that claims regarding a business's alleged misconduct or unreasonable conduct were properly within the scope of a limited arbitration provision.  See JPD, Inc. v. Chronimed Holdings, Inc., 539 F.3d 388 (6th Cir. 2008). In JPD, Inc., supra, Chronimed Holdings, Inc. ("Chronimed") purchased Northland Pharmacy ("Northland") from JPD, Inc. ("JPD").  Id. at 389.  The purchase agreement contained an earn-out provision contingent on Northland's performance in the year following acquisition.  Id. at 389-90.  When Chronimed informed JPD that earnings failed to meet the required earn-out target, JPD initiated proceedings under the purchase agreement's arbitration provision by formally objecting to

Chronimed's calculation.  Id. at 390.  Chronimed disagreed with JPD's objections and attempted, unsuccessfully, to resolve the matter amicably.  Id.

JPD sued Chronimed and asserted breach of contract, promissory estoppel, and unjust enrichment claims.  Id.  JPD alleged that Chronimed had depressed Northland's sales and earnings by "shortchanging some aspects of the operations and [through] poor decision-making."  Id.  Chronimed insisted that such claims required arbitration, citing the limited arbitration clause in the purchase agreement that required a "dispute" about Northland's earnings, "and all issues having a bearing on such dispute," to be submitted to binding arbitration.  Id. at 391.  JPD countered that the arbitration provision was limited to resolving disputes over the calculation of Northland's earnings, "not complaints regarding failed contractual commitments to maximize earnings, including Chronimed's failing 'to [reasonably] maintain the staffing of the company' and to 'hire an additional salesperson to support the growth of Northland Pharmacy.'"  Id.  The district court assumed the dispute was arbitrable, but found that Chronimed had waived its right to invoke arbitration.  Id. at 390.  The court granted a stay while Chronimed appealed the arbitration-waiver issue.  Id.

The court of appeals agreed with the district court's assessment that the claims were subject to arbitration.  Id. at 391.  Because the arbitration clause included the pivotal language of "all issues having a bearing on such dispute," the court found that JPD's claims regarding Chronimed's business practices "ha[d] a bearing on" Chronimed's calculation of Northland's earnings.  Id. (alteration in original).  The court concluded that arbitration was required, finding that "[f]airly

16

read, the arbitration provision encompasses [JPD's] *business-practice complaints*, as well as those focused on pure accounting issues." Id. (emphasis added). The court reasoned that although its interpretation was "not the only plausible one," because the scope of the arbitration clause was ambiguous, the law required resolution of that ambiguity in favor of arbitration. Id. (citation omitted).

### b. The First Circuit's Approach

On the other end of the spectrum are several cases from the First Circuit, most notably Fit Tech, Inc. v. Bally Total Fitness Holding Corp., 374 F.3d 1 (1st Cir. 2004). Fit Tech, Inc. ("Fit Tech") sold its fitness-center assets to Bally Total Fitness Holding Corporation ("Bally"), and, like the parties here, executed an asset purchase agreement that included an earn-out provision. Fit Tech, Inc., 374 F.3d at 2. The earn-out payment was dependent on the acquired fitness centers' earnings over a two-year measurement period. Id. at 3. The purchase agreement contained an arbitration provision similar to the one in this case, under which "any disagreement with respect to the" earn-out, if unresolved, would be referred "to the Accountants for final [and binding] determination." Id.

When disagreements arose, Fit Tech sued Bally, primarily charging Bally with breach of contract and breach of the implied covenant of good faith and fair dealing. Id. at 4. The allegations included "accounting violations" that were contrary to accounting principles and which had reduced the earn-out calculation, and also "operational violations" regarding intentional misconduct by Bally aimed at reducing earnings that would have increased the earn-out payment. Id. After Bally moved to compel arbitration, the district court bifurcated the claims, sending

certain accounting-related claims to arbitration, while retaining claims involving Bally's alleged operational misconduct. Id.

On appeal, the First Circuit affirmed the district court's bifurcation. Id. at 8. The court acknowledged that "operational misconduct could, just like ordinary accounting errors, alter the figures in the [earn-out] schedules and reduce the pay-out," but found that such operational issues fell outside the scope of the arbitration clause. Id. The court primarily relied on the plain language of the arbitration provision that directly referenced certain schedules and "accountants," reasoning that it made "most sense to read 'any disagreements' as referring to disagreements about *accounting* issues arising in the calculations that underpin the [earn-out] schedules." Id. The court further reasoned that "operational misconduct may well affect the level of earnings and therefore the [earn-out], but the misconduct itself would not be a breach of the proper accounting standards." Id. It also noted that the contracting parties would not expect accountants to be equipped to decide whether "business misconduct unrelated to accounting conventions was a breach of contract or any implied duty of fair dealing." Id. Accordingly, the First Circuit found proper the district court's decision to send the accounting issues to the accounting firm and to retain the claims regarding business misconduct and breach of contract. Id.

A district court in the First Circuit reached a similar conclusion in Powderly v. MetraByte Corp., 866 F. Supp. 39 (D. Mass. 1994). There, the dispute centered on an executive employee's contractual bonus that was contingent upon the operating profits of his employer, MetraByte Corporation ("MetraByte"). Powderly, 866 F.

18

Supp. at 41. The employee, John Powderly ("Powderly"), would receive a six-figure bonus if MetraByte's net operating profit exceeded $20 million over a five-year measurement period. Id. When MetraByte reported that the net operating profit failed to meet the required threshold for the bonus, Powderly sued. Id. He alleged, among other things, breach of contract based on a breach of the implied covenant of good faith and fair dealing. Id. According to Powderly, MetraByte intentionally diverted profits and charged inappropriate expenses to defeat his contractual bonus. Id. at 41-42.

MetraByte moved to compel arbitration, arguing that Powderly's claims all fell within the employment contract's limited arbitration provision. Id. at 42. The court disagreed, finding that Powderly's claims were beyond the scope of the arbitration clause, which required "independent public accounts" to "determine the Net Operating Profit" upon notice of Powderly's disagreement with his employer's calculations. Id. at 42-43. The court reasoned that the parties had not agreed to arbitrate claims of "wrongdoing" unrelated to accounting questions. Id. at 43. It explained that Powderly's claims did not concern accounting issues, but rather MetraByte's alleged manipulations of its business to defeat Powderly's bonus. Id.

### c. <u>The Instant Case</u>

We are persuaded by the Sixth Circuit's reasoning in <u>Navistar</u> and <u>JPD</u>. We find that those decisions both properly interpreted the arbitration clauses at issue and correctly applied the law regarding the presumption of arbitrability. The arbitration clause here requires arbitration of "any disagreement with respect to the calculation of the Revenue for the Measurement Period[.]" (APA § 1.7(a)).

First, we note that "any disagreement" is broad and inclusive language. Second, we find the phrase "with respect to the calculation of Revenue for the Measurement Period" to be ambiguous, as it is reasonably susceptible of different constructions or meanings, see Aleynikov. v. Goldman Sachs Grp., Inc., 765 F.3d 350, 362 (3d Cir. 2014) (applying Delaware law). The phrase could fairly be read to encompass only accounting practices and procedures affecting earn-out revenue calculations. By the same token, it could also fairly be read to cover related matters, including whether Advantage engaged in operational misconduct and unreasonable business practices to alter the revenue calculations and defeat a higher earn-out payment. In light of these alternative plausible interpretations, the presumption of arbitrability applies. JPD, Inc., 539 F.3d at 391. Accord CardioNet, Inc. v. Cigna Health Corp., 751 F.3d 165, 174 n.7 (3d Cir. 2014) (citing Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 301-02 (2010)).

The USG Entities' rejoinder is unpersuasive and does not rebut the presumption of arbitrability. The USG Entities contend that its claims *sub judice* involve Advantage's breach of Section 4.4 of the APA and attempted frustration of the APA's purpose. Regardless of how the claims are styled, the USG Entities' basic argument is that Advantage took actions that altered the calculation of revenue and artificially reduced the earn-out payment. As the Third Circuit has explained, when determining "whether a particular dispute falls within the scope of an arbitration clause," the proper focus is on "the factual underpinnings of the claim rather than the legal theory alleged in the complaint." CardioNet, Inc., 751 F.3d at 173 (quoting

<u>Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.</u>, 247 F.3d 44, 55 (3d Cir. 2001)).

The USG Entities' complaint makes clear that each claim of operational wrongdoing or commercial unreasonableness allegedly reduced revenues during the measurement period and thus deflated the earn-out payment. (Doc. 1 ¶¶ 11-18). Accordingly, despite the legal theories employed, the USG Entities are fundamentally challenging the calculation of revenue during the earn-out measurement period. In light of the broad language used in the APA's arbitration clause, and the presumption of arbitrability, we find that the USG Entities' claims fall within the scope of that provision and should have been raised during arbitration. Because the USG Entities should have raised these claims but did not, the claims are barred by the doctrine of claim preclusion.

## IV. <u>Conclusion</u>

The court will grant Advantage's motion (Doc. 8) to dismiss. Dismissal shall be with prejudice, as granting leave to amend would be futile. An appropriate order shall issue.

/S/ Christopher C. Conner
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated: June 25, 2018